Filed 11/25/20  In re J.R. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, <br>     Plaintiff and Respondent, <br>         v. <br> K.R., <br>     Defendant and Appellant. | A159045 <br><br> (Alameda County <br> Super. Ct. No. JD03164601) |

K.R., the alleged father of J.R., a teenage girl, appeals after the juvenile court sustained a Welfare and Institutions Code[1] section 300 petition filed by the Alameda County Social Services Agency (the Agency) and declared J.R. a dependent of the court, ordered her removed from parental custody, and denied him reunification services.  K.R. argues (1) he was not given proper notice of the jurisdiction/disposition hearing where the court issued the challenged orders, or notice of his right to seek to elevate his paternity status and be designated a presumed parent, (2) the court erred by proceeding with the hearing in his absence because he did not waive his right to appear, and

---

[1] All subsequent statutory references will be to the Welfare and Institutions Code, unless otherwise specified.

1

(3) the court abused its discretion by denying his counsel's motion for a continuance of the hearing.  We agree K.R. did not receive proper notice and the court erred by proceeding in his absence, and we conclude the errors were not harmless.  We therefore reverse the juvenile court's order and remand for further proceedings consistent with this opinion.

## I.  BACKGROUND

K.R. is the alleged father of J.R., who is currently 17 years old.  In late September 2019, the Agency filed a dependency petition on behalf of J.R., along with a detention report.  The petition included allegations under section 300, subdivisions (a) (serious physical harm inflicted by K.R.), (b)(1) (physical and verbal abuse by K.R.), and (g) (stating the ability of J.R.'s mother, M.C., to care for her was unknown).  The detention report stated J.R. had lived with her maternal grandparents but at some point before May 2019 began living with K.R.  In May 2019, the Agency removed J.R. from K.R.'s custody but returned her the next day.

The petition and detention report alleged that, on September 21, 2019, K.R. hit J.R. in the face at a laundromat, causing black bruising around her eye.  J.R. reported, and the Agency alleged, that K.R. punched her and dragged her by the hair at the laundromat.  K.R. then made J.R. walk home several blocks with the laundry as he drove home himself.  After J.R. returned home, K.R. became upset with her for not moving fast enough, and again started physically abusing her.  He hit her on the head, pushed her down onto a couch, and dug his fingers into her face.  J.R. attempted to leave the home several times, but K.R. stopped her.  K.R. hit J.R., pulled off her outer shirt, and at one point got on top of her and pushed his knee into her throat, making it painful to breathe.  Eventually, K.R. allowed J.R. to leave the home.

2

When the social worker spoke with J.R. on September 24, 2019, J.R. had bruising around her left eye, scratches on her face, as well as bruising and scratching on her right arm. J.R. reported these injuries resulted from K.R.'s abuse on September 21, 2019. In addition to the physical abuse, J.R. reported that K.R. verbally abused her. J.R. recorded K.R. (apparently on September 21, 2019) stating J.R. is "fake" and that he hoped other girls at school would beat her up. J.R. was crying while K.R. said that.

After leaving home on Saturday, September 21, 2019, J.R. did not return home. K.R. filed a runaway report with the police department and tried unsuccessfully to find J.R. at her school on September 23 and 24, with the school stating J.R. had not been there. A social worker was able to contact J.R. at her school on September 24 and interviewed her. After the interview, J.R. was taken into protective custody.

In the detention report, the social worker reported having several conversations with K.R. During an interview on September 24, 2019, K.R. stated that, on September 21 at the laundromat, J.R. refused to wash her clothes and threw some coins at him, so he slapped her on her head. K.R. denied slapping or hitting J.R. in the face, and he denied there had been other physical altercations between them. K.R. admitted leaving J.R. at the laundromat but stated it is a few blocks from their home. J.R. later returned home, and another argument broke out between the two of them, after which J.R. packed her belongings and left the house. K.R. stated he allowed J.R. to leave. K.R. told the social worker he believes J.R. is manipulative and planned the incident, including having a friend hit and scratch her to get K.R. in trouble. The social worker reported that, in the September 24 interview, K.R. "initially stated that he would not like [J.R.] to be returned to his care."

3

The social worker reported that, in a second conversation with K.R. on September 25, 2019, K.R. "said he is willing to have [J.R.] back in his home if she is willing to obey his rules." He wanted her to remain in foster care for a few weeks to realize the consequences of her actions and that "he is the only one there for her." He stated he usually has a good relationship with J.R. K.R. told the social worker he did not want to participate in the Child and Family Team meeting that was to be held on September 26, 2019. K.R. believed J.R.'s mother, M.C., would be a good placement for J.R.

On September 26, 2019, the social worker spoke by phone with K.R. K.R. said he had a suicide note from J.R., and that J.R. was out to get him and wanted him in jail. K.R. said he had " 'whooped' " J.R., by which he meant he " 'disciplined' " her. When pressed as to what happened specifically, K.R. said " 'whatever she said I did, I did.' " K.R. said he did not want to attend the detention hearing, which was set for September 27, 2019. The social worker provided K.R. with the time, date, and location of the detention hearing.

At the detention hearing on September 27, 2019, neither parent was present. The court appointed counsel for J.R. The court ordered J.R. detained and vested the Agency with discretion as to her temporary placement. J.R. wanted to remain at her high school and stay on track for early graduation. Based on J.R.'s request conveyed through her counsel, the court ordered that there be no contact or visitation between K.R. and J.R. The court scheduled the jurisdiction/disposition hearing for October 17, 2019.

In a report prepared for the October 17 hearing, the social worker stated she spoke with K.R. by phone on October 3, 2019. K.R. stated he did not want J.R. back in his care because he is unable to discipline her. He wanted her to live with her mother or in foster care. The social worker told

4

K.R. about a Child and Family Team meeting set for October 14 and the jurisdiction/disposition hearing set for October 17, but he said he did not want to attend. On October 7, 2019, the social worker learned that, on October 3, K.R. had been arrested for murder and was incarcerated at Santa Rita Jail.

In its report, the Agency recommended that the court sustain the allegations in the petition, declare J.R. a dependent, continue her out-of-home placement, and order the provision of reunification services to J.R.'s mother, M.C. The Agency did not recommend providing reunification services to K.R. because he was an alleged father and had not established a legal basis for receiving services.

On October 14, 2019, the Agency mailed to K.R. at the jail a Notice of Hearing on Petition, along with copies of the dependency petition and the social worker's report. The proof of service in the record states the method of mail service was "certified or return receipt requested." The record includes a receipt showing the Agency sent the documents by certified mail, although it does not include a receipt signed or returned by K.R.

At the October 17 hearing, K.R. was not present. The court appointed counsel for K.R. Counsel for the minor, J.R., stated she agreed with the Agency's recommendations. J.R.'s counsel also stated that, if K.R. were present at a future hearing, J.R. requested that she not have to see him or be in the courtroom with him, a request the court stated it would consider.

After hearing from J.R.'s counsel, the court addressed K.R.'s counsel, who stated that, as she had just been appointed, she did not know K.R.'s position as to the Agency's recommendations, although she entered a denial of the allegations on his behalf. Counsel asked the court to continue the hearing so she could contact K.R. and determine what his position was. The

Agency's counsel opposed the request, and the court denied it. The court found there was insufficient cause for a continuance, in light of K.R.'s "nonparticipation to date," noting he had not been incarcerated at the time of the detention hearing. The court also noted K.R. was "still in the legal standing of an alleged father at this point."

After this ruling, the court began making jurisdiction/disposition findings in accordance with the Agency's recommendations, but was then informed that J.R.'s mother, M.C., was present. The court appointed counsel for M.C. and granted a recess so M.C. and her counsel could confer. After the recess, M.C.'s counsel presented a waiver of rights signed by M.C. and her counsel, and M.C. submitted to the allegations in the petition. The court, after questioning M.C. and her counsel, accepted the waiver of rights and then continued making the jurisdiction/disposition findings. The court found that notice of the hearing had been given as required by law and that the allegations in the dependency petition were true. The court declared J.R. a dependent of the court, ordered her removed from the custody of both parents, placed her in foster care, and ordered reunification services and visitation for M.C. but not for K.R. As to K.R., the court stated: "The agency is not required to provide reunification services to [K.R.] because he is an alleged father, unless and until he establishes a legal basis for receiving those services."[2]

K.R. appealed the court's October 17, 2019 order.

---

[2] The minute order for the hearing states the Agency is to provide reunification services and arrange visitation for "the parents." But the court stated on the record that reunification services were to be provided to M.C. and not to K.R., and only ordered visitation for M.C.

## II. DISCUSSION

### A. *K.R. Did Not Receive Proper Notice of Either the Jurisdiction and Disposition Hearing or His Right To Seek To Elevate His Paternity Status*

K.R. correctly argues the written notice provided to him about the October 17, 2019 jurisdiction/disposition hearing did not comply with statutory requirements. Section 291 provides that, when a child is detained, notice of the jurisdiction/disposition hearing must be given at least five days before the hearing. (§ 291, subd. (c)(1).) Notice must be provided to both presumed and alleged fathers. (*Id.*, subd. (a)(2).) If the parent was not present at the detention hearing, he or she must be "noticed by personal service or by certified mail, return receipt requested." (*Id.*, subd. (e)(1).) Here, the proof of service in the record shows a "Notice of Hearing on Petition" was sent to K.R. at his place of incarceration on October 14, 2019, just three days before the hearing. Also, as to the method of service, the proof of service states the notice was mailed by "Certified *or* Return Receipt Requested" (italics added), creating some ambiguity as to whether there was compliance with the statutory requirement of service "by certified mail, return receipt requested" (§ 291, subd. (e)(1)).[3]

More significantly, as K.R. correctly contends, he was not provided with the required statutory notice of his right to attempt to elevate his status from that of an alleged father to a presumed father, a step that could have resulted in his receipt of reunification services. (See *In re J.W.-P.* (2020)

---

[3] The record includes certified mail receipts showing notices of the hearing were sent to K.R. and others. K.R. notes the record does not include a *return* receipt from him confirming his receipt of the notice. But section 291 does not require that a return receipt be provided (*In re Marcos G.* (2010) 182 Cal.App.4th 369, 386–387), so its absence here does not itself provide a basis for finding service was improper.

54 Cal.App.5th 298, 301 [in dependency proceedings, "[a]lleged fathers have 'fewer rights' and, unlike presumed fathers, 'are not entitled to custody, reunification services, or visitation' "].)

The procedure for providing an alleged father with notice of this right is set forth in section 316.2. That statute provides, in subdivision (b): "[E]ach alleged father shall be provided notice at his last and usual place of abode by certified mail return receipt requested alleging that he is or could be the father of the child. The notice shall state that the child is the subject of proceedings under Section 300 and that the proceedings could result in the termination of parental rights and adoption of the child. Judicial Council form Paternity-Waiver of Rights (JV-505) shall be included with the notice." (See Cal. Rules of Court, rule 5.635(g) [requiring the clerk to provide alleged parents with a copy of the petition, notice of the next scheduled hearing, and form JV-505].) Form JV-505 explains that an alleged parent will not receive reunification services and will not "automatically get the child to live with you or your relatives."

" 'Section 316.2 is designed to protect the alleged father's limited due process rights.' [Citations.] The notice required in section 316.2 provides an alleged father with critical information about an alleged parent's limited rights and explains the procedure he must follow to establish his paternity status: complete form JV-505. The court's '[f]ailure to provide the statutory notice denie[s]' an alleged father 'adequate notice of his rights and the ability to access the procedure for establishing paternity, obtaining reunification services, and ultimately seeking placement of his [child] in his home or with one of his relatives.' " (*In re J.W.-P.*, *supra*, 54 Cal.App.5th at pp. 306–307.) Here, there is no evidence the required notice under section 316.2 (including

8

form JV-505) was provided to K.R., either by certified mail as required by statute or by any other means.

The Agency contends K.R. may not raise in this appeal his challenges to this or other notice defects, but must instead present them by filing in the juvenile court a section 388 petition to change a court order. The cases cited by the Agency do not hold that a section 388 petition is the exclusive method to challenge defective notice. *In re Zacharia D.* (1993) 6 Cal.4th 435, 453–454, held that, where a man did not achieve presumed father status prior to the expiration of any reunification period (in that case because he waited until the 18-month review hearing before even asserting his *alleged* father status), his only remedy was to petition under section 388 for reconsideration of the juvenile court's earlier rulings based on new evidence or changed circumstances.

But when a parent timely appeals an order entered prior to the expiration of the reunification period—the scenario at issue here, as K.R. timely appealed the order entered at the jurisdiction/disposition hearing, at which the court ordered reunification services *to begin* for J.R.'s mother—the parent may properly contend on appeal that he did not receive adequate notice of the hearing and/or adequate notice of his right to seek to elevate his status to that of a presumed parent and to obtain services. (*In re J.W.-P.*, *supra*, 54 Cal.App.5th at p. 305, fn. 2, italics added [" '*[I]f* a man fails to achieve presumed father status prior to the expiration of any reunification period . . . [h]is only remedy . . . [i]s to file a motion to modify under section 388.' (*In re Zacharia D.*[, *supra*,] 6 Cal.4th [at p. 453].) In contrast, if father successfully challenges [via an appeal] the trial court's . . . order setting the 366.26 hearing, then he may request presumed father status

9

*without meeting the heightened requirements of a section 388 petition.*"]; see *id.* at pp. 304–306.)

The other cases cited by the Agency on this point hold that a parent *may* seek relief from notice violations via a section 388 petition; they do not hold such claims may not be raised in a timely appeal of a challenged order. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189, italics added ["A section 388 motion is *a proper vehicle* to raise a due process challenge based on lack of notice"; parent's section 388 petition challenged findings of proper notice that were made at earlier hearing]; *In re Marcos G., supra,* 182 Cal.App.4th at p. 380, fn. 8, italics added [noting that a prior case had "held that a challenge to a dependency judgment on lack of due process/notice grounds *is properly made* by means of a section 388 petition"; father's section 388 petition sought to challenge prior findings that proper notice had been given]; see *In re Christopher L.* (Nov. 2, 2020, B305225) ___ Cal.App.5th ___ [2020 Cal.App.Lexis 1042, *14–*15 & fn. 4] [father's challenge to error at jurisdiction/disposition hearing should have been raised by § 388 petition, rather than in appeal filed two years later challenging order terminating parental rights; appellate court excused forfeiture based on importance of issues raised].)

## B. *The Juvenile Court Erred by Proceeding with the Jurisdiction/Disposition Hearing in K.R.'s Absence*

K.R. argues the juvenile court erred by holding the jurisdiction/disposition hearing in his absence and without a valid waiver of his appearance. We agree. "When a parent is incarcerated, no petition under specified subdivisions of section 300 [including subds. (a) and (b), the ones at issue for K.R. here] 'may be adjudicated without the physical presence of the prisoner or the prisoner's attorney, unless the court has before it a knowing waiver of the right of physical presence signed by the prisoner or an affidavit

10

signed by the warden, superintendent, or other person in charge of the institution, or his or her designated representative stating that the prisoner has, by express statement or action, indicated an intent not to appear at the proceeding.' (Pen. Code, § 2625, subd. (d).)" (*In re A.J.* (2019) 44 Cal.App.5th 652, 667.) Our Supreme Court has explained that subdivision (d) of Penal Code section 2625 "requires *both* the prisoner *and* the prisoner's attorney be present." (*In re Jesusa V.* (2004) 32 Cal.4th 588, 622.)

Subdivision (b) of Penal Code section 2625 requires the juvenile court to order notice transmitted to an incarcerated parent for a jurisdiction or disposition hearing. (*In re Jesusa V., supra,* 32 Cal.4th at pp. 599–600, fn. 2.) The notice of a jurisdiction or disposition hearing must inform the prisoner of "his or her right to be physically present at the hearing and explain how the parent may secure his or her presence or, if he or she waives the right to be physically present, appearance and participation." (Cal. Rules of Court, rule 5.530(f)(1)(A).) "The notice must be served on the parent, his or her attorney, the person in charge of the institution, and the sheriff's department of the county in which the order is issued not less than 15 days before the date of the hearing, and it must include as attachments Judicial Council Form No. JV-450 [Order for Prisoner's Appearance at Hearing Affecting Parental Rights] and Judicial Council Form No. JV-451 [Prisoner's Statement Regarding Appearance at Hearing Affecting Parental Rights]. (Cal. Rules of Court, rule 5.530(f)(5).)" (*In re A.J., supra,* 44 Cal.App.5th at p. 667.)

Here, the juvenile court held the jurisdiction/disposition hearing in K.R.'s absence. But there is no evidence in the record that the required forms were sent to K.R., that he signed a waiver of his appearance, or that anyone from Santa Rita Jail provided an affidavit saying K.R. did not wish to attend.

11

The court erred under Penal Code section 2625 by proceeding with the jurisdiction/disposition hearing in these circumstances.[4] (*In re M.M.* (2015) 236 Cal.App.4th 955, 962–963.)

The Agency contends Penal Code section 2625 "only requires a waiver of an incarcerated parent's absence for a disposition hearing when there has been a statement by the incarcerated parent or his or her attorney that the incarcerated parent wants to be present," and because K.R. had told the social worker he did not want to attend, there was no violation of Penal Code section 2625. We disagree. K.R.'s statements to the social worker did not preclude him from deciding he wished to attend the hearing. Penal Code section 2625 sets forth a specific procedure for determining whether an incarcerated parent will attend a jurisdiction or disposition hearing: (1) the required notice and forms must be sent (Pen. Code, § 2625, subds. (b)–(c); Cal. Rules of Court, rule 5.530(f)(1)(A), (5)), and (2) either the prisoner or a custodial authority must respond in the specified manner, or the prisoner must be present at the hearing (Pen. Code, § 2625, subd. (d); Cal. Rules of Court, rule 5.530(f)(2), (4)). These requirements are linked: "Only by requiring the prisoner either to be present or to have executed a waiver of his or her appearance can the court ensure the prisoner actually received the

---

[4] At the jurisdiction/disposition hearing, K.R.'s counsel (who had just been appointed at the outset of the hearing) asked the court to continue the hearing so she could consult with K.R. about how he would like to proceed. The court denied the request. K.R. contends on appeal that this denial was an abuse of discretion because there was good cause for a continuance. (See § 352, subd. (a) [authorizing continuances of dependency hearings for good cause].) We need not address the question of good cause as a separate basis for finding error, because here, under Penal Code section 2625, it was error for the court to proceed with the hearing in K.R.'s absence, whether or not there was a showing of good cause to postpone the hearing.

notice." (*In re Jesusa V.*, *supra*, 32 Cal.4th at pp. 623–624.) The Agency has cited no authority stating these steps may simply be skipped based on a parent's statements to a social worker outside the formal notice procedure.

### C. *The Errors Were Prejudicial*

The Agency argues the above errors were harmless. We disagree. Whether the applicable standard of prejudice is (1) "the 'harmless beyond a reasonable doubt' standard," or (2) "the *Watson* standard," which "requires the appellant to show a reasonable probability of a more favorable outcome," we conclude the errors here were prejudicial. (*In re A.J.*, *supra*, 44 Cal.App.5th at pp. 665–666 [stating that some Court of Appeal cases have applied the more stringent standard to defective notice issues in dependency cases, while some Supreme Court cases have applied the *Watson* standard "even to constitutional errors in dependency cases"]; accord, *In re Christopher L., supra,* ___ Cal.App.5th ___ [2020 Cal.App.Lexis 1042, pp. *23–*24].)

There is a reasonable probability that, without the errors in failing to provide K.R. with proper notice (including notice of his right to seek to elevate his status to that of a presumed parent) and in proceeding with the hearing in his absence, the court would have designated him a presumed parent and granted him reunification services. A person is "presumed to be the natural parent of a child" if "[t]he presumed parent receives the child into their home and openly holds out the child as their natural child." (Fam. Code, § 7611, subd. (d).) J.R. lived with K.R. for at least a period of months prior to the September 2019 removal of J.R. from K.R.'s custody. In addition, J.R.'s mother, M.C., told the social worker that she and K.R. had been married at some point in the past, providing a second possible ground for K.R. to qualify as a presumed parent. (Fam. Code, §§ 7540, 7611, subd. (a).) The Agency does not argue that K.R. would not have qualified as a presumed

13

parent if he had been present at the hearing and had requested such a ruling from the court.

As a presumed parent, K.R. would have been entitled to reunification services under section 361.5 unless a statutory exception applied. (§ 361.5, subd. (a).) The Agency argues that, if K.R. had been designated a presumed parent, the court nonetheless might have denied him services under section 361.5, subdivision (e)(1), which governs the provision of services to incarcerated parents. We think that is speculative on this record. We note initially that, in its report for the jurisdiction/disposition hearing, the Agency itself did not mention section 361.5, subdivision (e)(1), as a basis for denying services to K.R., even though the Agency was aware by that point that K.R. had been arrested, a fact it recorded in the report.

In any event, section 361.5, subdivision (e)(1), specifies that, if a parent is incarcerated, "the court *shall* order reasonable services *unless* the court determines, by clear and convincing evidence, those services would be detrimental to the child." (§ 361.5, subd. (e)(1), italics added.) At the time of the jurisdiction/disposition hearing, K.R. had been arrested for murder, but he had not been tried, and it was unknown how long he would be in custody. (*Ibid.* [length of sentence, nature of crime, and likelihood of parent's discharge within the reunification period are relevant factors in assessing whether provision of services will be detrimental to child].) J.R.'s stated opposition to seeing K.R. in light of the alleged abuse did weigh in favor of finding services would be detrimental. (*Ibid.* [attitude of child 10 years of age or older toward services is relevant to detriment issue; court may also consider "any other appropriate factors"].) But in light of the early and uncertain state of K.R.'s incarceration, we think there is a reasonable probability the court would not have made a detriment finding by clear and

14

convincing evidence. (Cf. *In re Christopher L., supra,* \_\_\_ Cal.App.5th \_\_\_ [2020 Cal.App.Lexis 1042, *25–*32] [denial of services was "inevitable" under § 361.5, subd. (e)(1), and other bypass provisions, where length of parent's sentence prevented him from reunifying within the necessary time frame, he had no relationship with his child, and he had a lengthy criminal history that caused him to lose custody of three older children].)

The Agency suggests K.R.'s statements to the social worker establish he would not have wanted to participate in the dependency case even if he had received proper notice of the hearing and of his right to seek to elevate his status to that of presumed parent. But that, too, is speculative in our view. K.R. discussed the case with the social worker on multiple occasions; he did not avoid all communication. And the statements he made early in the proceedings, in conversations with the social worker, possibly while he was upset or frustrated about the situation, did not preclude him from taking a different position after being fully informed of his rights through the statutorily required methods. This is not a case in which a parent failed to communicate with a social services agency for an extended period and then suddenly expressed interest in participating near the end of the dependency case. (Cf. *In re Marcos G., supra,* 182 Cal.App.4th at pp. 388–389.) We cannot know with any confidence what position K.R. would have taken if he had been provided with the required notice of his right to seek presumed parent status and reunification services (and the means to do so, i.e., form JV-505), the option to be transported from jail for the hearing, and the ability to consult with his attorney about the choices available to him. We think there is a reasonable probability he would have sought a set of rulings that differed from those the court issued.

15

Finally, the Agency argues there was overwhelming evidence supporting the allegations in the dependency petition, so the court would have sustained the allegations and ordered out-of-home placement for J.R. even in the absence of the errors involving notice to K.R. Again, we disagree. While not discounting the severity of the abuse K.R. allegedly inflicted on J.R., we note the court decided *as uncontested matters* the questions whether to sustain the allegations in the petition, declare J.R. a dependent, and order out-of-home placement for her. J.R.'s counsel agreed with the Agency's recommendation. Mother signed a waiver of rights and submitted to the allegations in the petition. No testimony was taken. And, as noted, the court denied the request by K.R.'s counsel for a continuance to ascertain his position. In our view, if the errors discussed above had not occurred, there is a reasonable probability K.R. would have opposed the Agency's recommendations as to jurisdiction, placement, and services, and the court thus would have held a contested jurisdiction/disposition hearing. On the relatively thin record before us, we are unable to share the Agency's confidence as to what the result of that hearing would have been. We conclude there is a reasonable probability the outcome would have been different, so we must reverse the juvenile court's order.

In reaching this conclusion, we stress that our reversal and remand may well be a futile exercise. We acknowledge the severity of K.R.'s alleged abuse of J.R., her stated strong opposition to seeing him (let alone reunifying), and his admission, in one conversation with the social worker, that he did what J.R. said he did (although he denied some of the conduct in other conversations). There is a good chance that, at a new jurisdiction/disposition hearing, the juvenile court will again find the allegations of abuse to be true and order that J.R. be placed in foster care

16

rather than with either of her parents. We also recognize that, since K.R. has been arrested for murder, there is a chance he will be incarcerated for a very long time. For that or other reasons, the court may once again decline to order services for him. In short, it is possible, even likely, that our reversal will not ultimately result in the juvenile court's issuing a different set of rulings from those it issued at the October 2019 jurisdiction/disposition hearing.

But for the reasons discussed above, we conclude reversal is nonetheless required. The significant failures to comply with statutory notice and related requirements resulted in a truncated proceeding and record, making it impossible to have confidence, under any standard of prejudice, that the result of the hearing would have been the same absent the errors. Such a conclusion, in our view, would necessarily be based on speculation. (Cf. *In re Christopher L., supra,* ___ Cal.App.5th ___ [2020 Cal.App.Lexis 1042, *21] [affirming despite notice errors; concluding the record permitted harmless error finding that was "based 'not on guesswork or speculation, but on the undisputed facts before us' "].)

## III. DISPOSITION

The juvenile court's October 17, 2019 order is reversed. The case is remanded for further proceedings.

STREETER, J.

WE CONCUR:

POLLAK, P. J.
BROWN. J.

17